**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| FRANK MOLINARO, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | 10-5791 (NLH)(AMD) |
| v. | : | |
| | : | **OPINION** |
| THE UPS HEALTH & | : | |
| WELFARE PACKAGE | : | |
| AETNA LIFE INSURANCE COMPANY, | : | |
| | : | |
| Defendants. | : | |

---

**APPEARANCES:**

THOMAS JOSEPH HAGNER
HAGNER & ZOHLMAN, LLC
57 KRESSON ROAD
CHERRY HILL, NJ 08034
     *Attorney for plaintiff*

EDWARD P LYNCH
HEATHER WEINE BROCHIN
DAY PITNEY LLP
ONE JEFFERSON ROAD
PARSIPPANY, NJ 07054-2891
     *Attorneys for defendants*

**HILLMAN, District Judge**

        Plaintiff, Frank Molinaro, seeks reimbursement of benefits

due to him under his long term disability policy with defendant,

The UPS Health & Welfare Package, which is administered by

defendant Aetna Life Insurance Company.  The long term disability

plan at issue is an employee welfare benefit plan governed by the

Employee Retirement Income Security Act (hereinafter "ERISA"), 29

U.S.C. § 1001 et seq.  The Court is called upon to determine
whether the termination of plaintiff's long term disability
benefits was arbitrary and capricious, and, therefore, unlawful
pursuant to 29 U.S.C. § 1132(a)(1)(B).  Both plaintiff and
defendants have moved for summary judgment in their favor.  For
the reasons expressed below, the Court will grant plaintiff's
motion, deny defendants' motion, and order the submission of
supplemental materials on damages and fees.

**I.   JURISDICTION**

Plaintiff brought his claims pursuant to ERISA and this
Court has jurisdiction over his claims under 28 U.S.C. § 1331 and
29 U.S.C. § 1132(d)(e)&(f).

**II.  BACKGROUND**

On April 30, 2008, plaintiff, an airplane mechanic at UPS,
began disability leave due to a workplace injury.  Initially,
Plaintiff received short-term disability ("STD") coverage under
the UPS Health & Welfare Plan.  On October 10, 2008 he was
informed that his STD benefits would expire on November 12, 2008.
Plaintiff then filed a claim for long-term disability ("LTD")
benefits in order to continue his disability leave after November
12, 2008.

Under the terms of the Plan, plaintiff was responsible for
paying monthly LTD premiums, which were automatically deducted
from his paycheck prior to his injury.  When he began STD,

2

however, plaintiff was then required to write a check and mail
his LTD premium payments to UPS directly in order to maintain
eligibility for LTD benefits.

According to plaintiff, while he was on STD he had
difficulty obtaining his LTD billing notices from UPS in order to
pay his LTD premiums, and he contacted customer service about
this issue.[1]  UPS disputes this.  Whatever the reason, it is
undisputed that plaintiff was late in making his LTD premium
payments.  The July 10, 2008 statement informed plaintiff that
his coverage would be terminated unless he satisfied an unpaid
balance.  The bill stated, "Coverage will be terminated effective
4-29-2008 unless your unpaid previous balance of $195.59 is
received.  Once terminated, coverage cannot be reinstated.  THIS
IS YOUR FINAL NOTICE FOR THE UNPAID PREVIOUS BALANCE."  The July
statement also notified plaintiff that his premium for August in
the amount of $64.48 was due.  The statement did not provide a
specific date that the unpaid balance or August premium was due.
Plaintiff submitted a check for the entire $260.07 balance by a
check dated July 15, 2008, which was received by UPS on July 28,
2008.

The August 10, 2008 billing notice noted plaintiff's $260.07
payment, and billed for September's $64.48 LTD premium.  This

---

[1]Plaintiff claims that he tried to set up an automatic debit
card arrangement, but was told that UPS would only accept a check
sent through the mail.

statement stated, "Full payment is due on 9-01-2008."  It is unclear whether plaintiff received the August statement, but plaintiff did not make this payment, as reflected by the next month's billing notice.

The September 10, 2008 statement showed an outstanding unpaid balance of $64.48 for the September premium, and billed $64.48 for the October premium.  It stated, "Coverage will be terminated effective 8-31-2008 unless your unpaid previous balance of $64.48 is received by 9-30-2008.  Once terminated, coverage cannot be reinstated.  THIS IS YOUR FINAL NOTICE FOR THE UNPAID PREVIOUS BALANCE.  Your current balance is due on 10-01-2008."

Plaintiff claims that he did not receive the September 10, 2008 billing notice until around September 23, 2008.  He mailed a $128.96 check to UPS dated October 1, 2008, which was received and deposited on October 9, 2008.  Crossing in the mail, UPS sent plaintiff an October 7, 2008 letter informing him that his LTD benefits were terminated because of nonpayment of premiums. Plaintiff's last payment was returned to him, and he filed two appeals regarding the termination of his benefits.[2]  Unsuccessful in his appeals, plaintiff filed the instant suit against UPS and

---

[2] Despite the termination of his LTD benefits under the Plan, Aetna mistakenly continued to send plaintiff LTD benefit checks for seven months.  The implications of this mistake are discussed below.

4

its claims administrator, Aetna Life Insurance Company, to recover LTD benefits he claims are due under the Plan.  The parties have each moved for summary judgment in their favor.

## III. DISCUSSION

### A.    Standard for Summary Judgment

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

### B.    Standard of Review for Plaintiff's Claim

ERISA provides that a plan participant or beneficiary may bring a suit "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  The statute, however, does not specify a standard of review for an action brought pursuant to § 1132(a)(1)(B).  Mitchell v. Eastman Kodak Co., 113 F.3d 433, 437 (3d Cir. 1997).  The Supreme Court addressed this issue and opined that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless

5

the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). When the plan affords the administrator with discretionary authority, courts must review the benefit decision for an abuse of discretion. Firestone Tire & Rubber Co., 489 U.S. at 115; see also Howley v. Mellon Fin. Corp., 625 F.3d 788, 793 n.6 (3d Cir. 2010) (explaining that courts in this Circuit have referred to this standard of review as "abuse of discretion" or "arbitrary and capricious" - these standards of review are essentially identical and the terms are interchangeable).

The parties agree that the abuse of discretion/arbitrary and capricious standard applies to this case because the Plan gives the plan administrator discretionary authority to decide eligibility benefits or interpret terms of the Plan.

**C. Abuse of Discretion Analysis**

Under the abuse of discretion standard of review, "the Court's role is not to interpret ambiguous provisions *de novo*, but rather to 'analyze whether the plan administrator's interpretation of the document is reasonable.'" Connor v. Sedgwick Claims Management Services, Inc., 796 F. Supp. 2d 568, 580 (D.N.J. 2011) (quoting Bill Gray Enters. Inc. Employee and Health Welfare Plan v. Gourley, 248 F.3d 206, 218 (3d Cir. 2001))

6

(other citation omitted).  A decision is considered arbitrary and capricious "if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."  Abnathya v. Hoffman-La Roche, Inc., 2 F.3d 40, 45 (3d Cir. 1993).

To determine whether a plan administrator abused its discretion, the Court must focus "on how the administrator treated the particular claimant."  Miller v. Am. Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011) (quoting Post v. Hartford Ins. Co., 501 F.3d 154, 162 (3d Cir. 2007)).  "Specifically, in considering the process that the administrator used in denying benefits, we have considered numerous irregularities to determine whether . . . the administrator has given the court reason to doubt its fiduciary neutrality."  Id. (internal quotations omitted).  This is accomplished "by taking account of several different, often case-specific, factors, reaching a result by weighing all together."  Id. (quoting Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105, 117 (2008)).

The scope of a court's review is narrow, however, and the court "is not free to substitute its own judgment for that of the plan administrator in determining eligibility for plan benefits." Connor, 796 F. Supp. 2d at 579 (quotation omitted).  Thus, the plaintiff retains the burden to prove that he is entitled to benefits, and that the plan administrator's decision was arbitrary and capricious.

7

In this case, the Court finds that plaintiff has met his burden of showing that UPS's termination of his LTD benefits was an abuse of discretion.  The Court makes this determination because the reasons UPS proffered for the termination of benefits and the denial of plaintiff's appeals are not supported by the plain language of the Plan documents, and because of the arbitrary and capricious way it assessed plaintiff's delinquencies.

In its November 24, 2008 denial of plaintiff's first appeal, UPS explains that plaintiff's LTD benefits were cancelled effective August 31, 2008 because his overdue premium payment for September was not received by the September 30, 2008 deadline provided in the billing notice.  To support the termination of his LTD benefits for a payment that was received 9 days past the deadline provided to him in the billing notice, UPS refers to the "Life Events" section of the Summary Plan Description (SPD).  The denial letter states, "Plan provisions state if you take an approved leave of absence, you must continue to pay for your share of the cost of your coverage in order to continue your coverage.  Please refer to the Life Events section of the UPS Health and Welfare Package Summary Plan Description."

The January 19, 2009 denial of plaintiff's second, and final, appeal contained the following explanation: (1) "In the 'Life Events' section under 'Personal Leave' of your Summary Plan

Description, it states that if you elect coverage and then fail to make timely and full payments, your coverage will be terminated.  Additionally, if the amount submitted for payment is insufficient to pay for your supplemental coverage, your supplemental coverage will be terminated."; (2) the August 10, 2008 billing notice required that his payment for September was due on September 1, 2008, but no payment was received by that due date; (3) the September 10, 2008 billing notice informed plaintiff that his unpaid previous balance "must be received by September 30, 2008 or coverage would be cancelled effective August 31, 2008"; (4) "As noted in the SPD, if you fail to make timely payments, your coverage will be terminated."

There are several problems with the explanations provided by UPS to support its decision to terminate plaintiff's LTD benefits.  First, the "Life Events" section of the SPD does not contain the language relied upon by UPS.  The "Life Events" section explains how a UPS employee's employment status would affect his benefits under the plan, most of which are inapplicable to plaintiff - it explains what happens if the employee leaves UPS, retires, goes on military leave, loses outside medical coverage, dies, acquires a dependent, is laid off, or a dependent is no longer eligible.

Three of the "Life Events" sub-sections may be applicable to plaintiff, but they still do not support UPS's reasoning.  One

event is, "What if . . . you fail to maintain edibility?"  This
sub-section explains that after meeting the Plan's initial
eligibility provisions, the employee must receive earnings at
least one day during the current calendar month to maintain
eligibility during that month.  An exception to this condition is
an approved leave of absence, which specifies benefit extension
provisions in another part of the SPD "Life Events" section.
Thus, this provision in the SPD is not directly applicable to
plaintiff's situation, and it also does not address the effect of
late LTD premium payments.

     Another possibly applicable provision in the "Life Event"
section of the SPD is "What if you . . . take an approved leave
of absence?"  The first part of this provision addresses FMLA
leave, which does not apply to plaintiff.  The second part is
"Personal Leave," which is the section UPS relies upon in its
denial of plaintiff's appeal.  The provision provides,

     You may also continue coverage if you are on another
     type of approved leave of absence, such as personal
     leave, that involves a reduction in your earnings and
     you pay the full cost of coverage.  You may elect a
     change in coverage within 30 days of the start of your
     reduction in salary--effective retroactive to the first
     day of your reduction in salary.  You may not change
     your family status for medical, dental and vision care
     benefits.  Any coverage change that you elect will
     remain in effect through December 31 following the date
     your leave begins, even if you return to work.

     In its letter denying plaintiff's appeal, UPS represents

that this section "states that if you elect coverage and then
fail to make timely and full payments, your coverage will be
terminated.  Additionally, if the amount submitted for payment is
insufficient to pay for your supplemental coverage, your
supplemental coverage will be terminated."  (January 13, 2009
Appeal Denial Letter.)  The plain language of the "Personal
Leave" provision in the "Life Events" section of the SPD quoted
above clearly does not state what UPS says it does.[3]

The final provision in the "Life Events" section of the SPD
that may be applicable to plaintiff is "What if . . . you become
disabled?"  This provision provides, "You and your dependents
still have medical protection if you become disabled.  If you are
receiving short-term disability, your UPS Health and Welfare
Package participation continues.  You make contributions for
supplemental coverage as if you were an active employee."  UPS
did not rely upon this provision specifically, and even if it
did, nothing in this language explains the specific
repercussions of late LTD premium payments.

Thus, it is evident that the SPD "Life Event" section does

_____

[3] It is also questionable whether the "Personal Leave"
section applies to plaintiff's leave of absence, which is due to
a workplace injury, particularly because the SPD contains a
separate section concerning disability leave.  Even if "Personal
Leave" encompasses leave due to a workplace injury, the "Personal
Leave" section does not contain any information regarding the
effect of late LTD payments.

not support UPS's reasoning for justifying the termination of
plaintiff's LTD benefits.  Because, however, UPS also refers
generally to the SPD, as well as the other Plan documents, in its
denial letters, and because "ERISA requires, in no uncertain
terms, that the summary plan description be accurate and
sufficiently comprehensive to reasonably apprise plan
participants of their rights and obligations under the plan,"
including the "circumstances which may result in
disqualification, ineligibility, or denial or loss of benefits,"
see Burstein v. Retirement Account Plan For Employees of
Allegheny Health Educ. & Research Found., 334 F.3d 365, 378-79
(3d Cir. 2003), the Court will look to other applicable parts of
the SPD and Plan documents to determine whether it can support
UPS's termination of LTD benefits for a late payment of
premiums.[4]

The SPD contains three pages dedicated to explaining long-
term disability benefits.[5]  Within this provision, there are

_____

[4] The Court was not provided with the entire Summary Plan
Description, and the Court presumes that the portions that were
not provided are irrelevant to the case.

[5] The SPD explains that long-term disability "provides
protection from disabilities caused by non-occupational illness
or injuries that last longer than 26 weeks."  It appears that
plaintiff was approved for LTD benefits relating to his workplace
injury.  Thus, is unclear to the Court why plaintiff was granted
LTD benefits in the first place.  Because, however, any issue
concerning the initial decision to grant plaintiff LTD benefits
is not before the Court, the Court takes no position on the
matter.

several parts relevant to this case.  First are the eligibility
requirements.  The SPD explains that full-time employees are
eligible to elect the LTD option at annual enrollment, or if
there is a valid change in status.  The SPD then explains how an
employee may lose eligibility:

> Eligibility under the plan will automatically end for
> any disability that occurs after the earliest of these
> events:
> * your employment with UPS terminates
> * you retire
> * you cease to be an eligible employee
> * you enter full-time military service
> * you die, or
> * you cease making contributions for the benefit.

In their brief, defendants contend that this provision
supports the termination of plaintiff's LTD benefits - that is,
plaintiff became ineligible for LTD benefits because he ceased
making contributions.  Plaintiff disputes this interpretation,
and the Court agrees with plaintiff.  This provision plainly
provides that if an employee suffers a disability after the
employee has stopped making his LTD benefits, then he is not
eligible for those benefits.  This provision does not address
what happens when an employee is current on his LTD
contributions, becomes disabled, and then is delinquent on those
payments.

The LTD section of the SPD also has an "Exclusions and

13

Limitations" provision and a "Benefit Termination" provision, but these provision also fail to address the effect of premium payment delinquencies.  The "Exclusions and Limitations" provision explains that LTD benefits are not payable for any disability that results from various things, such as self-inflicted injuries, participation in a felony, or act of war, but none of the exclusions concern the non-payment of premiums.  The "Benefit Termination" provision is similarly silent as to the effect of delinquent payments.  It provides,

> There are certain conditions which could cause your LTD benefits to be terminated.  These occur when you:
> *   cease to have a disability as defined by the plan
> *   fail to provide medical documentation requested by the plan administrator
> *   fail to comply with a reasonable course of medical treatment and care . . .
> *   fail to comply with an independent medical examination . . .
> *   refuse an offer or fail to continue participating in a rehabilitation program . . .
> *   have been paid 60 months of LTD benefits.

The only mention of premium payments in the entire long-term disability section of the SPD is, "Long-term disability benefits begin when short-term disability coverage ends, or after 26 weeks, whichever is later.  During this waiting period, you must continue to pay your portion of LTD premiums."  It does not describe what happens if you make late payments.

Thus, although the SPD explains to a plan participant that

14

he must make LTD contribution payments even when he is out on
leave, whether it be on STD, LTD or some other form of approved
leave, and it could be reasonably inferred that those payment
must be made in a timely manner, the Summary Plan Description
does not provide notice to a plan participant regarding the
specific repercussions of a late payment.

The language of the Plan itself is similarly unspecific.[6]
Article III concerns "Eligibility and Participation," and
section 3.4 concerns the "Cessation of Participation."  It
provides,

> An Enrolled Person will cease to be an Enrolled
> Person, and all Benefit coverage with respect to the
> Enrolled Person and his or her Enrolled Dependents will
> end, as of the earliest of:
>
> (a)  the date of the Plan's termination;
>
> (b)  the Enrolled Person's termination from
>      employment with the Employer Company . . . ;
>
> (c)  the Enrolled Person's loss of eligibility to
>      participate in the Plan;
>
> (d)  the date on which the Enrolled Person's
>      coverage is canceled by reason of his or her
>      failure to make timely payment of his or her
>      share of the cost of Benefit coverage;
>
> (e)  [regarding a dependent];
>
> (f)  [regarding military leave].

This Plan provision regarding the cancellation of benefit
coverage for the participant's "failure to make timely payment"

---

[6]The SPD controls if it conflicts with the Plan language.
<u>Burstein</u>, 334 F.3d at 379.

is the only provision that correlates late payments with termination of benefits.  Consequently, based on this provision in the Plan, and the general proposition in the SPD that a participant is required to make LTD premium payments while on leave, the question to be answered is whether the Plan was arbitrary and capricious in interpreting those provisions to mean it could terminate plaintiff's benefits for being 9 days late in paying a one-month delinquency.  The Court finds that the answer is "yes."

As explained above, to assess the propriety of a Plan administrator's interpretation of the Plan, a court must consider different, case-specific factors and weigh them together.  Miller, 632 F.3d at 845.  The court must also focus on how the administrator treated this particular claimant.  Id.  In this case, as of July 2008, plaintiff had been three months delinquent in his LTD premium payments, but his benefits were not terminated at that time.  Instead, on the July 10, 2008 billing notice, plaintiff was notified that if he did not pay the three-month delinquency his benefits would be terminated, but the notice did not inform him that his benefits would be automatically terminated if payment was not received by a specific date.

The September 10, 2008 notice follows a noticeably different pattern.  After only a one month delinquency, Plaintiff is notified of the possibility of benefit termination.  Unlike the

16

July billing notice, this notice contained a due date, with his delinquency payment due by September 30, 2008.  In contrast to the early delinquency, Plaintiff was only provided a twenty day window to receive the notice from UPS and mail back a check for a one-month delinquency.  Plaintiff's payment was received 9 days late.[7]  This time, however, plaintiff's markedly shorter delinquency was sufficient to warrant complete termination of all his LTD benefits.

Such a draconian termination policy would not violate the Plan's fiduciary duties to plaintiff if it had been described in the SPD or contemplated by the Plan language itself.  The Plan detailed numerous, specific circumstances that would cause a participant to lose coverage, and a simple "What if . . . you fail to pay your premium by the due date?" instruction would alert the participant to the strict payment requirements. Instead, the Plan generally requires that a participant make

---

[7] Plaintiff argues that based on the explanatory material sent with his billing notices, which were prepared by a third-party billing service, he had a thirty-day grace period for payments, and, therefore, his October payment was actually timely.  Defendants counter that those materials cannot be considered by the Court because they were not contained in the administrative record on which UPS based its decision to uphold the termination of plaintiff's benefits.  They also argue that the 30-day grace period does not cause plaintiff's October delinquency payment to be timely.  Because the Court finds that UPS abused its discretion in terminating plaintiff's benefits even when considering that plaintiff's payment was late, the Court will not resolve this issue.  We note, however, that this ambiguity only highlights the lack of certainty, clarity, and fair warning inherent in Defendants' written plan materials.

17

timely premium payments, but it provides no specifics as to what "timely" means.  Under that broad framework, it is truly arbitrary to terminate benefits for a one-month deficiency payment received 9 days late, particularly when a prior three-month delinquency did not warrant termination or provide a deadline for termination.

Moreover, the capriciousness of the Plan administrator's decision is further evidenced by its reliance upon SPD provisions that do not stand for the propositions it claims supports the termination of benefits.  The final appeal denial letter states that plaintiff's LTD benefits were terminated because "In the 'Life Events' section under 'Personal Leave' of your Summary Plan Description, it states that if you elect coverage and then fail to make timely and full payments, your coverage will be terminated.  Additionally, if the amount submitted for payment is insufficient to pay for your supplemental coverage, your supplemental coverage will be terminated."  As described above, the SPD says none of these things.

The finding that the Plan abused its discretion in terminating plaintiff's LTD benefits under these circumstances is not to suggest that another set of circumstances could not warrant a different result under the current SPD.  For example, if plaintiff had missed six premium payments despite having received six billing notices with payment due dates, and a final,

18

"pay now or lose your benefits" notice, the Plan's decision to terminate benefits in that situation based on an interpretation of the SPD to require timely LTD benefit payments could present a different case.  That is hardly the situation here, however.

Even though the Plan administrator has discretion to construe the terms of the Plan, the interpretation must be must be reasonable in this specific situation.  It was not. Consequently, plaintiff is entitled to judgment in his favor on his claim that the Plan's termination of his benefits was in violation of ERISA.

### D.   Remedy

The Third Circuit has directed that when a Court has found that a Plan has abused its discretion in terminating benefits, "retroactive reinstatement of a claimant's benefits is the proper remedy when the administrator's termination decision was unreasonable."  Miller, 632 F.3d at 856-57 (explaining that an important distinction emerges between an initial denial of benefits and a termination of benefits after they were already awarded - in a situation where benefits are improperly denied at the outset, it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled; in the termination context, a finding that a decision was arbitrary and capricious means that the administrator terminated the claimant's benefits unlawfully, and, accordingly, benefits should be

reinstated to restore the status quo).

Thus, in this case, plaintiff should be awarded the LTD benefits he would have been entitled to had his benefits not been terminated, minus the appropriate premiums plaintiff owed.  That award is not so simple in this case, however.  Even though it appears that the maximum benefit plaintiff is entitled to runs from November 13, 2008 through February 6, 2012, the date plaintiff returned to work, UPS mistakenly continued to pay plaintiff LTD benefits from November 13, 2008 through June 30, 2009.  It appears that plaintiff accepted those payments, which total $17,951.20, he never paid his premiums during that time, and UPS has not been refunded.

Additionally, as explained in the SPD, plaintiff's LTD benefits are subject to offsets from other income he has received related to his disability, including worker's compensation awards and civil litigation settlements.  It appears that plaintiff has received both a worker's compensation award and a settlement of a legal claim.  According to defendants, these offsets, along with the erroneous payment of LTD benefits, far exceed the amount he is entitled to having been successful in proving his claim here.

Plaintiff has not squarely addressed defendants' argument about damages, arguing that the issue was beyond the scope of the determination as to whether the Plan abused its discretion in terminating plaintiff's benefits.  Therefore, the Court will

20

order plaintiff to provide a certification of damages allowable under ERISA and in accordance with the Plan.  Additionally, because ERISA contains an express statutory departure from the American Rule with regard to attorney's fees, <u>see</u> 29 U.S.C. § 1132(g)(1) ("In any action . . . by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party."), should plaintiff seek the reimbursement of attorney's fees and costs, plaintiff shall provide a certification of fees, in addition to a brief supporting the propriety of an award of those fees. Defendants will be afforded the opportunity to respond to plaintiff's submissions.  After reviewing the supplemental materials with regard to damages and fees, the Court will enter a final judgment.

## IV. CONCLUSION

For the reasons expressed above, plaintiff's motion for summary judgment will be granted as to liability, and defendants' motion for summary judgment will be denied.  The issue of damages and the entry of final judgment will be addressed after consideration of supplemental materials.  An appropriate order will be entered.


Date: January 23, 2013                   s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.